UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSEPH ANTHONY SUTTON,

        Petitioner,

                                CASE NO. 2:13-cv-14789

v.                             HONORABLE SEAN F. COX

THOMAS MACKIE,

        Respondent.

_____/

**OPINION AND ORDER DENYING THE HABEAS CORPUS PETITION,
DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY, AND
GRANTING LEAVE TO APPEAL *IN FORMA PAUPERIS***

Petitioner Joseph Anthony Sutton, a state prisoner in the custody of the Michigan

Department of Corrections, filed an amended habeas corpus petition challenging his state

convictions for first-degree murder, possession of a firearm during the commission of a

felony ("felony firearm"), and felon in possession of a firearm.  He alleges as grounds for

relief that:  (1) the prosecution suppressed evidence of police misconduct to conceal the

fact that death threats were used to force a prosecution witness to testify falsely against

him, and the prosecutor lied to the trial court to validate the witness's testimony; (2)

defense counsel provided ineffective assistance by failing to notify the trial court that

death threats were used to force the prosecution witness to testify  against Petitioner; (3)

trial counsel was ineffective for failing to call expert witnesses in Petitioner's behalf; and

(4) appellate counsel omitted compelling issues during the direct appeal.  (ECF No. 22,

PageID.1969.)  The State argues in an answer to the amended petition that Petitioner's

claims about the prosecutor and trial counsel lack merit and that Petitioner did not make

a credible claim about appellate counsel.  (ECF No. 23, PageID.2022.)  Having reviewed the pleadings and record, the Court concludes that Petitioner's claims do not warrant habeas corpus relief.  Accordingly, the amended petition will be denied.

## I.  Background

### A.  The Charges, Trial, and Sentence

Petitioner was charged in Wayne County, Michigan with first-degree, felony-murder, Mich. Comp. Laws § 750.316(1)(b), first-degree, premeditated murder, Mich. Comp. Laws § 750.316(1)(a), possession of a firearm during the commission of a felony, Mich. Comp. Laws § 750.227b, and felon in possession of a firearm, Mich. Comp. Laws § 750.224f.   Petitioner was tried before a jury in Wayne County Circuit Court.   The Michigan Court of Appeals accurately summarized the basic facts in the case as follows:

> Defendant's convictions arise from the murder of Edith Hamilton–Watts, hereafter the victim, who was shot four times inside the Financial Exchange, a check-cashing and food stamp store that she managed.  The victim was murdered on February 22, 1996.   On the day of the murder, police responded to the scene and discovered the victim's body on the floor in the employee area of the store.  The police found a 16–square–inch, freshly cut hole in the roof above a small storage room in the employee area.  The safe and the cash drawer were undisturbed.  A partial shoe or boot print was recovered from a piece of fallen roofing tar.  None of the evidence from the scene contained usable fingerprints.   Four fired cartridge cases were discovered in the employee area, and it was determined that the casings were fired from the same gun.  An autopsy of the victim revealed that she was shot at close range in the left cheek, left jaw, left shin, and the lower left side of her abdomen.  Police suspected that there were multiple perpetrators with inside information about the store because a walkie-talkie was recovered, there was no ladder used, the alarm was not tripped, and it appeared that the perpetrators had knowledge of when the money would be available.
>
> Defendant did not become a suspect in the murder until October 2008, when Charmane Murphy, his ex-girlfriend and mother of his daughter, came forward and told police that defendant confessed to committing a murder. Murphy testified that several years ago she and defendant were stopped at a red light near the Financial Exchange when defendant stated:  "I killed

somebody at the check cashing, food stamp office." Defendant told Murphy that he shot someone in the head. He informed her that he had worked with two other people, it was an inside job, there was no guard present, they planned to take cash out of the safe, and they broke into the building through the roof of the bathroom. Defendant also stated that the female employee who he shot went to grab her gun but he beat her to the draw. Defendant said he left without taking any money because no one was supposed to be in the store. Defendant also told Murphy that he broke through roofs to get into other businesses, and "he needed certain tools like a saw ... a sledge hammer to break the roof in and pull back the ... the tar (sic) it's like three layers to get into the crawlspace."[1]

Defendant's cousin, Andre Devon Christian, also testified about an incident where defendant described breaking into a check-cashing store and killing someone. In 2008, Christian lived with defendant, and testified that when defendant was high on cocaine he told Christian that he went by himself to rob a west side check-cashing store, by cutting a hole in the roof of the bathroom ceiling. A woman entered the building when he was inside. Defendant shot her and left the building. In previous testimony, Christian indicated that defendant committed the robbery with another person, that defendant may have said that he had taken some money during the robbery, and that it was a credit union or bank.

Both Murphy and Christian had motives to implicate defendant in the murder. Murphy and defendant had a tumultuous relationship, and Murphy was involved in a custody dispute with defendant over their daughter. Ten days before approaching police about defendant's involvement in the murder Murphy was arrested for attempting to break into defendant's home where her daughter was staying. The day Murphy contacted police about the murder was her daughter's birthday. Christian was in prison serving a one year sentence for receiving and concealing stolen property when the police approached him about the murder. Christian agreed to testify against defendant, and in exchange his probation term was reduced by a year. Christian admitted he wanted to get out of prison, and shortly after giving a statement to police he was released.

Defendant's first trial began on October 12, 2010, but a mistrial was declared due to juror misconduct. A new jury was impaneled on October 13, 2010, and on October 21, 2010, the jury convicted defendant of felony murder, first-degree premeditated murder, felony-firearm, and felon in possession.

---

[1]  In Murphy's statement to the police she did not state that defendant told her it was an inside job, that the woman was shot in the head, or that two other men conspired with defendant.

*People v. Sutton*, No. 304035, 2012 WL 2335341, at *1–2 (Mich. Ct. App. June 19, 2012) (unpublished) (footnote in original).

Petitioner did not testify at trial.  The only defense witness was a police officer who testified about the attempted home invasion at Petitioner's residence ten days before Murphy contacted the police concerning Petitioner's admissions to her about the killing.

Petitioner's defense was that the prosecution's case depended on a jaded ex-girlfriend and a cousin, both of whom disliked him and had motives for implicating him in the murder.  Defense counsel stated in his closing argument that Murphy could have learned about the murder from another source, that she had issues and made wild accusations, and that she failed to mention the murder to anyone until 2008 even though she had been seeing a psychologist or psychiatrist since 2001.  Defense counsel argued that, even though Murphy may have believed that Petitioner told her about the murder, that did not mean it really happened.  (10/20/10 Trial Tr., ECF No. 12-19, PageID.1300-1304.)

Defense counsel pointed out that there was no physical evidence linking Petitioner to the crime, and he claimed that Christian's story improved every time he told it because he had a plea agreement with the prosecutor.  Defense counsel also argued that Murphy's and Christian's stories were not consistent with each other or with their prior statements. *Id*. at PageID.1304-1307.

As noted above, Petitioner was convicted, as charged, on October 21, 2010. (10/21/10 Trial Tr., ECF No. 12-20, PageID.1330-1331.)  On November 15, 2010, the trial court sentenced Petitioner to two terms of life imprisonment without the possibility of parole for the murder convictions, two years in prison for the felony-firearm conviction,

with credit for 286 days, and one to five years in prison for the felon-in-possession conviction. The court ordered Petitioner to serve the sentence for the felony-firearm conviction first and to serve the other three sentences concurrently with each other, but consecutively to the time spent in prison for the felony-firearm conviction.  (11/15/10 Sentencing Tr., ECF No. 12-21, PageID.1347.)

## B. The Direct Appeal

Petitioner appealed his convictions and sentences through counsel, who argued that:  (1) Petitioner was denied a fair trial because the trial court allowed the prosecutor to introduce evidence that, twelve years after the crime, Petitioner allegedly made a vague statement to a relative about the commission of a homicide at a similar establishment in a manner similar to the facts in his case; (2) the trial court incorrectly cured *Batson*[2] violations by restoring only the last illegally excused juror to the panel; (3) the prosecutor deprived Petitioner of a fair trial by bolstering Murphy's credibility and eliciting her testimony that Petitioner had broken through the roofs of other businesses, and trial counsel was ineffective for failing to object to the evidence in a timely manner and to move for a mistrial; (4) Petitioner's convictions and sentences for two counts of murder for the murder of one person violated his right to protection against double jeopardy; and (5) the prosecution failed to present legally sufficient evidence that he committed the murder.  (Defendant-Appellant's Brief on Appeal, ECF No. 12-22, PageID.1372).

In a *pro se* supplemental brief, Petitioner argued that: (1) the prosecution violated his right to a fair trial by refusing to disclose a witness's perjured testimony; and (2) trial counsel was ineffective for failing to reveal evidence that the police used death threats

---

[2]  *See Batson v. Kentucky*, 476 U.S. 79 (1985).

against Christian and his relatives to compel Christian to say whatever was necessary to prevent Petitioner from being released.  *Id.* at PageID.1407.

The Michigan Court of Appeals affirmed Petitioner's convictions and sentences for felony-firearm and felon in possession of a firearm, but it agreed with Petitioner's double jeopardy argument.  To cure the error, the Court of Appeals remanded the case so that the trial court could amend the judgment of sentence to reflect one conviction and one sentence for first-degree murder based on two theories.  *Sutton*, 2012 WL 2335341, at *1, *10-*11.

In a subsequent application for leave to appeal in the Michigan Supreme Court, Petitioner raised three claims:  (1) the prosecution violated his right to a fair trial by refusing to disclose information that could have been used to impeach perjured testimony; (2) trial and appellate counsel refused to present evidence that the police forced Christian to give corroborating testimony by convincing Christian that, if he did not testify, Petitioner would be released and then murder Christian's mother and grandmother; and (3) the prosecution presented insufficient evidence that Petitioner committed the crime. (Application for Leave to Appeal, ECF No. 12-23, PageID.1483.)  On November 20, 2012, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the questions presented to the court.  *See People v. Sutton*, 493 Mich. 893; 822 N.W.2d 563 (2012).

### C.  The Initial Habeas Corpus Petition, Motion to Dismiss, and Stay

On November 20, 2013, Petitioner filed his initial habeas corpus petition in this case.   In his supporting brief, Petitioner argued that: (1) his appellate attorney was ineffective; (2) defense counsel's failure to call expert witnesses was a critical error; (3)

6

the prosecutor misinformed the trial court and jury about how he obtained Christian as a witness and failed to disclose evidence that Christian had been forced to testify by death threats; and (4) trial counsel failed to inform the trial court that the officer in charge of the case used death threats to force a witness's testimony.  (Pet., ECF No. 1, PageID.11.)

The State moved to dismiss the petition on the basis that Petitioner had failed to exhaust state remedies for all his claims. (Mot. to Dismiss, ECF No. 11.)  Petitioner subsequently asked the Court to hold his petition in abeyance while he pursued post-conviction remedies in state court.  (Mot., ECF No. 15.)  On January 12, 2015, the Court denied the State's motion to dismiss the habeas petition, granted Petitioner's motion to hold his habeas petition in abeyance, and closed this case for administrative purposes. (Op. and Order, ECF No. 16.)

### D.  The Post-Conviction Motion in State Court and Subsequent Appeals

On July 15, 2015, Petitioner filed a motion for relief from judgment in the state trial court.  He argued that:  (1) the prosecutor falsified and covered up evidence that a witness was forced to testify due to death threats; (2) trial counsel was ineffective in that he failed to (a) notify the trial court that a key witness's testimony was false, (b) reveal that the witness was forced to testimony, (c) present evidence that the prosecutor covered up the death threats with false stories, and (d) call expert witnesses to testify about the main witness's mental health records; and (3) appellate counsel omitted these compelling issues on direct appeal.  (Mot. for Relief from J., ECF No. 24-2, PageID.2079-2089, 2105, 2121, 2128, 2137.)  The trial court's successor denied Petitioner's motion on procedural grounds and for lack of merit.  (2/18/16 Order Denying Mot. for Relief from J., ECF No. 24-4, PageID.2168-2181.)

Petitioner appealed the trial court's decision, but the Michigan Court of Appeals denied leave to appeal because Petitioner had failed to establish that the trial court erred in denying his motion for relief from judgment.  *See People v. Sutton,* No. 331760 (Mich. Ct. App. Aug. 4, 2016).   Petitioner then applied for leave to appeal in the Michigan Supreme Court, which denied leave to appeal on May 2, 2017, because Petitioner had failed to establish entitlement to relief under Michigan Court Rule 6.508(D).  *See People v. Sutton*, 500 Mich. 981; 893 N.W.2d 614 (2017).

### E.  The Amended Habeas Corpus Petition and Re-Opening of this Case

On June 12, 2017, Petitioner returned to federal court with a motion to lift the stay (ECF No. 19) and an amended petition (ECF No. 22).[3]  The Court granted Petitioner's motion to lift the stay and re-opened this case.  (3/08/18 Op. and Order, ECF No. 21). The State subsequently filed a response to the amended petition, *see* Answer in Opp'n to Pet., ECF No. 23, and Petitioner filed a reply, *see* Petitioner's Rebuttal, ECF No. 25.[4]

### II.  Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires prisoners who challenge "a matter 'adjudicated on the merits in State court' to show that

---

[3]  Petitioner actually filed two amended habeas corpus petitions.  One of the amended petitions challenged Petitioner's unrelated conviction for second-degree murder in Wayne County Circuit Court case number 09-3565.  *See* Am. Pet., ECF No. 20, PageID.1811. The other amended habeas petition challenges Petitioner's first-degree murder conviction in Wayne County Circuit Court case number 10-2034.  *See* Am. Pet., ECF No. 22, PageID.1932. The first-degree murder conviction is the one at issue in this case.  When the Court realized that Petitioner was trying to challenge two unrelated convictions in one federal habeas action, the Court directed the Clerk of the Court to open a new case that addressed Petitioner's challenge to his conviction for second-degree murder. (3/08/18 Op. and Order, ECF No. 21.)

[4]  Petitioner filed a second reply, ECF No. 26, but that reply addresses Petitioner's conviction for second-degree murder, which is not under consideration in this case.

the relevant state court 'decision' (1) 'was contrary to, or involved an unreasonable application of, clearly established Federal law,' or (2) 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.' " *Wilson v. Sellers*, 138 S. Ct. 1188, 1191 (2018) (quoting 28 U.S.C. § 2254(d)).  The Supreme Court has explained that

> a state court decision is "contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent."

*Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor,* 529 U.S. 362, 405-406 (2000) (alterations added)).

> "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.,* at 413, 120 S.Ct. 1495. The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous. *Id.,* at 410, 412, 120 S.Ct. 1495.  The state court's application of clearly established law must be objectively unreasonable. *Id.,* at 409, 120 S.Ct. 1495.

*Id.* at 75.

"AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt[.]' " *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal and end citations omitted).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Thus, "[o]nly an 'objectively unreasonable' mistake, . . . , one 'so lacking in justification that there was an error well understood and comprehended in existing law

beyond any possibility for fairminded disagreement,' slips through the needle's eye of §

2254." *Saulsberry v. Lee*, 937 F.3d 644, 648 (6th Cir.) (quoting *Richter*, 562 U.S. at 103),

*cert. denied*, 140 S. Ct. 445 (2019).  "That's a 'high bar' to relief, which 'is intentionally

difficult to meet.' "  *Kendrick v. Parris,* __ F.3d __, __, No. 19-6226, 2021 WL 788431, at

*7 (6th Cir. Mar. 2, 2021) (quoting *Woods v. Donald*, 575 U.S. 312, 316 (2015)).

### III.  Analysis

#### A.  The Prosecutor

Petitioner alleges first that the prosecutor suppressed evidence that death threats

were used to induce Christian to testify against him.  According to Petitioner, the police

informed Christian that Petitioner was threatening to kill Christian and members of

Christian's family and that if Christian did not testify against Petitioner, Petitioner would

be released and proceed to kill Christian and Christian's mother and grandmother.   The

death threats apparently were mentioned in one or more of Christian's audiotaped phone

calls from jail.  There is no official transcript of the audiotaped calls in the record before

the Court.  Petitioner, nevertheless, contends that the prosecutor lied to the trial court and

to the jury when he explained that he first became aware of Christian as a potential

witness when Christian's audiotaped phone calls from jail were mistakenly released to

the prosecution with Petitioner's audiotaped jail calls.   (Am. Pet. ECF No. 22,

PageID.1980-1991.)

The successor trial court considered Petitioner's claim on post-conviction review

and concluded that Petitioner's due process claim was barred from review.   This

conclusion was based on Michigan Court Rule 6.508(D)(3), which states that, with one

exception not relevant here, a defendant is not entitled to relief from judgment if the

defendant alleges a ground for relief that could have been raised on appeal, unless the defendant demonstrates "good cause" for the failure to raise the issue on appeal from the conviction and sentence and "actual prejudice from the alleged irregularities that support the claim for relief."

The successor court stated that Petitioner could have raised his due process claim on appeal because he conceded that the prosecution provided defense counsel with Christian's jail calls on April 8, 2010, which was six months before Petitioner's trial.  The court concluded that the prosecution had not suppressed Christian's jail calls and that Petitioner had failed to show "actual prejudice" from the claimed error.   (Order Denying Mot. for Relief from J., ECF No. 24-4, PageID.2172-2175.)

### 1.  Clearly Established Federal Law

Contrary to the successor court's finding, Petitioner did raise an issue on direct appeal about the prosecutor's alleged suppression of evidence.  The Michigan Court of Appeals treated the claim as abandoned because Petitioner did not state what information the prosecution allegedly withheld.  *Sutton,* 2012 WL 2335341, at *6 n.3.  This Court, nevertheless, proceeds to address Petitioner's claim on the merits, because the State has not argued that any of Petitioner's claims are procedurally defaulted.  *See* Answer in Opp'n to Pet., ECF No. 23, PageID.2026; *id*. at PageID.2039, n.1.

"On habeas review, 'the Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.' " *Trimble v. Bobby*, 804 F.3d 767, 783 (6th Cir. 2015) (quoting *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006)) (alteration in original).  Further, even though

prosecutors must "refrain from improper methods calculated to produce a wrongful conviction," *Viereck v. United States*, 318 U.S. 236, 248 (1943), prosecutorial-misconduct claims are reviewed deferentially in a habeas case, *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004).

Petitioner relies on *Brady v. Maryland*, 373 U.S. 83 (1963), to support his claim about the prosecutor.   In *Brady*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material, either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id*. at 87.  A true *Brady* claim has three components: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

Petitioner also implies that the prosecutor suborned perjury.  Prosecutors "may not knowingly present false evidence."  *United States v. Fields*, 763 F.3d 443, 462 (6th Cir. 2014) (citing *Miller v. Pate,* 386 U.S. 1 (1967)).  The Supreme Court has made clear that "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.' "  *Giglio v. United States*, 405 U.S. 150, 153 (1972) (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)).  "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears."  *Napue v. Illinois*, 360 U.S. 264, 269 (1959).  But "[t]o prove that the prosecutor's failure to correct false testimony violated due process rights, a petitioner must demonstrate that: (1) the statement was actually false; (2) the statement

was material; and (3) the prosecution knew it was false." *Rosencrantz v. Lafler*, 568 F.3d

577, 583–84 (6th Cir. 2009); *see also Amos v. Renico*, 683 F.3d 720, 728 (6th Cir. 2012).

Petitioner must demonstrate that the testimony in question was "indisputably false" and

that the alleged perjury was not harmless error.  *Monea v. United States*, 914 F.3d 414,

421 (6th Cir. 2019).

### 2. Application

The record before the Court does not support Petitioner's claim that the prosecutor

suppressed evidence of Christian's audiotaped calls from prison or that the prosecutor

lied when he claimed that the audiotapes led him to Christian.  At a pretrial motion hearing

and conference on July 7, 2010, the trial court acknowledged the audiotapes and

arranged for Petitioner to listen to the audiotapes on July 9, 2010.  (7/7/10 Mot. Hr'g, ECF

No. 12-9, PageID.640-641.)   Further, during the trial, the prosecutor stipulated that

Christian had made phone calls while he was confined at the Wayne County Jail in 2009.

Defense counsel then requested permission to use a portion of the audiotapes to impeach

Christian.  In response, the trial court stated that defense counsel could impeach Christian

with a phone call in which Christian stated that he disliked Petitioner, because Christian

had testified differently at trial.  The trial court prohibited defense counsel from asking

Christian whether Petitioner had ever threatened Christian or his mother and his

grandmother.  (10/19/10 Trial Tr., ECF No. 12-18, PageID.1184-85.)

These excerpts from the record indicate that Petitioner and defense counsel were

aware of Christian's audiotaped calls from jail and that the prosecutor did not suppress

the tapes or information that Petitioner had threatened to kill Christian or members of his

family.  Petitioner's *Brady* claim, therefore, lacks merit.

Petitioner's perjury claim lacks merit because he has not shown that Christian's testimony was indisputably false.  Christian's testimony corroborated Murphy's testimony, and there is no indication in the record that Christian and Murphy colluded with each other to blame Petitioner for the murder.  Christian claimed that he did not know Murphy well and that he had never had an extended conversation with her.  *Id*. at PageID.1171.

In addition, Christian independently divulged what he knew about Petitioner's admissions several months after Murphy talked to the police.  Unlike Murphy, he did not approach the police with information about Petitioner.  Instead, a police officer approached Christian and asked him whether he knew anything about Petitioner committing a murder.  *Id*. at PageID.1170; 10/20/10 Trial Tr., ECF No. 12-19, PageID.1244, 1258.

The officer who took Christian's statement testified that he asked Christian an open-ended question and that he did not suggest anything about the victim or Petitioner breaking into a building and shooting a person in the building.  The officer did not tell Christian what to say, because he wanted Christian's response.  (10/20/10 Trial Tr., ECF No. 12-19, PageID.1259.)

Christian testified that, if the police officer had never come to him, he would not have implicated Petitioner in the murder because he did not believe Petitioner when Petitioner told him about the murder.  He thought that Petitioner was bragging at the time. *Id*. at PageID.1244-1245.

Based on the foregoing facts, Petitioner's claims that Christian perjured himself and that the police suppressed evidence of death threats against Christian lack merit. Additionally, the state courts' rejection of Petitioner's prosecutorial-misconduct claim was

objectively reasonable.  Petitioner, therefore, has no right to relief on his claim about the prosecutor.

### B.  Trial Counsel

Petitioner's second ground for relief is that his trial attorney provided constitutionally ineffective assistance by failing to discover and notify the trial court that the prosecution used death threats to force Christian to testify falsely against Petitioner. According to Petitioner, the officer in charge of the case notified Christian that Petitioner had threatened to kill Christian and members of Christian's family and that this information induced Christian to testify against Petitioner.  As previously explained, it appears that the death threats were mentioned in recorded phone calls that Christian made from jail.

Petitioner raised his claim on direct appeal.  He alleged that defense counsel was ineffective for failing to impeach Christian with recordings that showed Christian believed Petitioner would murder Christian and his family if Petitioner were released from jail.  The Court of Appeals rejected this claim because the appellate record contained no transcript or other information about the contents of the contested parts of the audio recordings between Christian and members of his family.  *Christian*, 2012 WL 2335341, at *9.  The Court of Appeals also stated that, even if the audio recordings depicted what Petitioner claimed, he could not overcome the presumption that defense counsel's actions were reasonable trial strategy.  The Court of Appeals opined that defense counsel presumptively "made a strategic decision about what parts of the audio recordings would most successfully impeach Christian and be least prejudicial to [Petitioner]."  *Id*.

The successor trial court rejected Petitioner's claim, as well, on post-conviction review.  The court stated that Petitioner did not raise his specific claim about trial counsel

on appeal. The court then opined that, even if Christian's jailhouse calls demonstrated that the police made an implied threat to him, the threats would have gone to the weight of Christian's testimony, not its admissibility. The court concluded that Petitioner had failed to demonstrate prejudice under *Strickland v. Washington*, 466 U.S. 668 (1984), and "actual prejudice" under Rule 6.508(D)(3). (Order Denying Mot. for Relief from J., ECF No. 24-4, PageID.2175-2176.)

### 1. Clearly Established Federal Law

This Court reviews Petitioner's claim on the merits. The clearly established federal law for the claim is *Strickland*. *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011). The Supreme Court stated in *Strickland* that "the proper standard for attorney performance is that of reasonably effective assistance." *Strickland*, 466 U.S. at 687. To establish that counsel's assistance was so defective as to require reversal of a conviction, a convicted person must show that his attorney's performance was deficient and that the deficient performance prejudiced the defense. *Id*. Unless the convicted individual "makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id*.

An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Id*. at 688. A defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. "Judicial scrutiny of counsel's performance must be highly deferential." *Id*. at 689. Because of the difficulties inherent in evaluating an attorney's performance,

> a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant

16

must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id*. (internal citation omitted).

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. The defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "This does not require a showing that counsel's actions 'more likely than not altered the outcome,' " but "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 111-12 (quoting *Strickland*, 466 U.S. at 693).

### 2. Application

Petitioner alleges that he, not trial counsel, requested disclosure of Christian's recorded phone calls from jail. He seems to be saying that trial counsel was ineffective for failing to discover the audiotapes and for not trying to prevent Christian from testifying once the audiotapes were discovered. But defense counsel did file a pretrial motion *in limine* to exclude Christian's testimony about Petitioner's alleged statements to him. (Defense Mot. in Limine, ECF No. 12-24, PageID.1704-1708; 7/7/10 Mot. Hr'g, ECF No. 12-9, PageID.608-620.) Although he was unsuccessful, counsel was not ineffective merely because the trial court denied his motion. *Hemphill v. United States*, 601 F. Supp.2d 249, (D.D.C. 2009).

The audiotapes, moreover, were produced months before Petitioner's trial, and the trial court arranged for Petitioner to listen to the tapes on July 9, 2010, which was almost three months before trial. (7/7/10 Mot. Hr'g, ECF No. 12-9, PageID.640-641.) Thus, any

delay caused by defense counsel's alleged failure to seek disclosure of the audiotapes could not have prejudiced Petitioner.

To his credit, defense counsel used excerpts from the audiotapes to impeach Christian's trial testimony with evidence that Christian was biased against Petitioner and had a reason to testify against him. Although the court reporter did not record and transcribe excerpts of the audiotapes that were played for the jury, it is obvious from Christian's response to defense counsel's questions that, in a phone conversation on June 24, 2009, Christian told his grandmother that he disliked Petitioner. (10/19/10 Trial Tr., ECF No. 12-18, PageID.1188-1189.) And in a phone conversation on June 22, 2009, Christian asked his attorney to try to get his sentence reduced because he wanted to get out of jail. *Id*. at PageID.1189-1191.

Defense counsel was not ineffective for failing to question Christian or any other witness about death threats made against Christian, because Petitioner's handwritten transcription of an alleged audiotape indicates that he made the death threats. (Am. Pet., ECF No. 22, PageID.1987-1988.) The trial court, moreover, prohibited defense counsel from asking any questions about whether Petitioner had ever threatened Christian or anyone else. (10/19/10 Trial Tr., ECF No. 12-18, PageID.1184-1185.)

Petitioner, nevertheless, contends that the audiotapes show Christian had an additional reason to testify against him: his family wanted to keep $25,000 that Petitioner had tendered to Christian's grandmother for the purchase of her house. (Am. Pet., ECF No. 22, PageID.1992-1998.) Defense counsel, however, cross-examined Christian at Petitioner's preliminary examination as to whether Petitioner had given Christian's grandmother $25,000 to purchase her house, and Christian denied knowing anything

about that.  (2/17/10 Prelim.  Examination, ECF No. 12-2, PageID.504-505.)  Defense counsel could have concluded that it was not worthwhile to pursue the topic at trial.

Defense counsel chose to attack Christian's testimony in other ways.  During his cross-examination of Christian at trial, he insinuated that Christian had learned about the murder from discussing the case with Petitioner or another relative while he and Petitioner were confined in jail.  Defense counsel also tried to impeach Christian with inconsistencies in his testimony.  (10/19/10 Trial Tr., ECF No. 12-18, PageID.1198-1199, 1201-1212; 10/20/10 Trial Tr., ECF No. 12-19, PageID.1218-1230.)

Defense counsel tried to discredit Christian's testimony by asking him whether he had any prior convictions for a crime involving dishonesty.  Christian then admitted that he had been convicted of receiving and concealing stolen property in 2009 and two counts of unlawfully driving away a vehicle in 2001.  (10/20/10 Trial Tr., ECF No. 12-19, PageID.1230-1232.)  Defense counsel also questioned Christian about his favorable agreement with the prosecution in return for his trial testimony.  *Id*. at PageID.1232-1235, 1245-1246.

Defense counsel's trial strategy was not unreasonable, and his alleged failure to seek audiotapes of Christian's jailhouse phone calls did not amount to deficient performance.  Therefore, the state courts' rejection of Petitioner's claim was not contrary to, or an unreasonable application of, *Strickland*, and Petitioner is not entitled to relief on his claim.

### C.  Trial Counsel's Failure to Call an Expert Witness

Petitioner alleges next that his trial attorney was ineffective for failing to call expert witnesses in his behalf to testify about Murphy's mental health records.  Petitioner

contends that, when Murphy initially concluded he was involved in the murder, she was refusing treatment for her condition and was using alcohol, cocaine, and marijuana.[5] Petitioner also contends that Murphy suffered from auditory hallucinations, delusions, and schizophrenia.   Further, according to Petitioner, Murphy began believing that her delusions were reality, she invented arguments, and she accused people of things that never happened.  (Am. Pet., ECF No. 22, PageID.1934, ¶ 12; *id*. at PageID.1940, 2004.) Petitioner alleges that his remarks to Murphy about the murder were based on street rumors and news reports, and that Murphy interpreted his comments as admissions that he committed the crime.   *Id*. at PageID.2004, 2007.   For all these reasons, Petitioner contends that trial counsel should have produced expert witnesses to evaluate Murphy's mental health records.

The trial court's successor adjudicated this claim on post-conviction review and determined that the claim was procedurally barred by Michigan Court Rule 6.508(D)(3) because Petitioner did not raise the claim on appeal, and he failed to demonstrate actual prejudice.  The court concluded that Petitioner was not prejudiced by his trial attorney's decision not to call Murphy's health care providers as witnesses, because Murphy's mental illness was addressed at trial.  The court concluded that Petitioner had failed to establish prejudice under *Strickland* and actual prejudice under Rule 6.508(D)(3).  (Order on Mot. for Relief from J., ECF No. 24-4, PageID.2177-2178.)   Petitioner maintains that

---

[5]  The murder at the check-cashing place on Livernois occurred in 1996.  Murphy testified at trial that Petitioner told her about the murder in 2004 or 2005 and that she was being treated with medication for mental disorders at the time. Defense counsel impeached Murphy with her testimony from the preliminary examination where she stated that Petitioner told her about the murder in 2002 or 2003.  On re-direct examination, Murphy admitted that she was not sure of the dates, but she was certain about what Petitioner had told her.  (10/18/10 Trial Tr., ECF No. 12-17, PageID.1070, 1080, 1108-1114.)

an expert witness could have affected the outcome of the trial, that the trial court erred when it ruled that his attorney was all that the jury needed to make its decision, and that it was unreasonable trial strategy to forego use of an expert witness.  (Am. Pet., ECF No. 22, PageID.1940, 1999, 2005.)

### 1.  Legal Framework

The Court presumes that trial counsel's conduct fell "within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight."  *Bell v. Cone*, 535 U.S. 685, 702 (2002) (citing *Strickland*, 466 U.S. at 689).   "*Strickland* specifically commands that a court 'must indulge [the] strong presumption' that counsel 'made all significant decisions in the exercise of reasonable professional judgment.' "  *Pinholster*, 563 U.S. at 196 (quoting *Strickland*, 466 U.S. at 689-90); *see also Cathron v. Jones*, 77 F. App'x 835, 841 (6th Cir. 2003) (stating that, "[u]nder *Strickland* , we must presume that decisions of what evidence to present and whether to call or question witnesses are matters of trial strategy") (citing *Hutchison v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002)).

Although "[i]t can be assumed that in some cases counsel would be deemed ineffective for failing to consult or rely on experts," "[t]here are . . . 'countless ways to provide effective assistance in any given case.' "  *Richter*, 562 U.S. at 106 (quoting *Strickland*, 466 U.S. at 689).  "Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach."  *Id*. (quoting *Strickland*, 466 U.S. at 689).

### 2.  Application

Petitioner's trial attorney did not rely on expert witnesses, but he managed to have some of Murphy's psychiatric records admitted as exhibits.  (10/18/10 Trial Tr., ECF No. 12-17, PageID.1077-1080.)   Defense counsel also thoroughly questioned Murphy about her history of mental illness.  He elicited Murphy's testimony that, at one point, she was diagnosed with bipolar and schizophrenic disorders.  *Id*. at PageID.1075-1076.

Murphy also admitted on cross-examination by defense counsel that:  in 2003, she informed medical staff that she was starting to believe things that did not happen; in July of 2005, she reported auditory hallucinations; in 2007, she was taking medication for schizophrenia; in 2008, she informed a psychologist that she was having delusional thoughts and dreams about demons following her, and on October 30, 2008, she reported Petitioner's admissions about the murder to the police.  Murphy further admitted that:  at times, she stopped taking her medication and would self-medicate with cocaine, marijuana, and alcohol; she informed mental health professionals that she would invent arguments and accuse people of things; and health care workers at one treatment center terminated their services because Murphy did not comply with the recommended treatment.  *Id*. at PageID.1976**,** 1084-1089**,** 1092.

"[T]he failure to seek an expert does not satisfy the performance prong of *Strickland* where counsel chooses a strategy that does not require an expert." *Swaby v. New York*, 613 F. App'x 48, 50 (2d Cir. 2015) (quoted with approval in *Kendrick*, 2021 WL 788431, at *11).   And in this case, an expert witness was unnecessary because defense counsel adequately challenged Murphy's testimony through cross-examination, argument, and the admission of Murphy's mental health records.  He "was entitled to

formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Richter*, 562 U.S. at 107.  Further, the state court's conclusion -- that trial counsel was not ineffective -- was objectively reasonable.  Petitioner, therefore, has no right to relief on his claim.

### D.  Appellate Counsel

In his fourth and final claim, Petitioner alleges that his appellate attorney was constitutionally ineffective for failing to assert his other claims in the appeal of right.  (Am. Pet., ECF No. 22, PageID.2010-2019.)  The successor trial court adjudicated this claim during the post-conviction proceedings and concluded that appellate counsel was not ineffective.  The court stated that Petitioner's due process claim lacked merit because the prosecution provided Petitioner with Christian's jailhouse calls six months before the trial, and any claim that the prosecution suppressed the calls would have been frivolous. (Order Denying Mot. for Relief from J., ECF No. 24-4, PageID.2178-2179.)

The successor court also found no merit in Petitioner's claim about trial counsel. The court stated that defense counsel's failure to bring Christian's jailhouse calls to the trial court's attention lacked merit because the contents of the calls would have gone to the weight of Christian's testimony, not its admissibility.  As for defense counsel's failure to produce an expert witness, the successor court stated that Petitioner had not demonstrated any prejudice from the decision not to call any of Murphy's mental health care providers as witnesses.  *Id*. at PageID.2179-2180.

### 1.  Clearly Established Federal Law

The proper standard for evaluating a claim about appellate counsel is the standard enunciated in *Strickland*.  *Smith v. Robbins*, 528 U.S. 259, 285 (2000).  To prevail on his

claim, Petitioner must demonstrate (1) that appellate counsel acted unreasonably in failing to discover and raise non-frivolous issues on appeal, and (2) there is a reasonable probability that he would have prevailed on appeal if his attorney had raised all his claims. *Id*. (citing *Strickland,* 466 U.S. at 687-91, 694); *see also Pollini v. Robey*. 981 F.3d 486, 493 (6th Cir. 2020) (stating that, "to prevail on a *Strickland*-based ineffective assistance of appellate counsel claim, [the petitioner] must satisfy two prongs: (1) that his appellate counsel was deficient, and (2) that the deficiency prejudiced him").

An appellate attorney is not required to raise every non-frivolous claim requested by his or her client if the attorney decides, as a matter of professional judgment, not to raise the claim. *Jones v. Barnes*, 463 U.S. 745, 751 (1983). In fact,

> the process of " 'winnowing out weaker arguments on appeal' " is "the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986) (quoting *Barnes*, 463 U.S. at 751-52, 103 S.Ct. 3308). "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986).

*Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002).

### 2. Application

Petitioner raised his claim about the prosecutor's alleged suppression of evidence and the related claim about trial counsel in his *pro se* supplement brief on appeal. Thus, he was not prejudiced by appellate counsel's failure to raise those claims on direct appeal.

Petitioner's remaining claim -- that defense counsel should have called expert witnesses to testify about Murphy's psychiatric records -- lacks merit because the records were admitted in evidence and trial counsel questioned Murphy about her history of mental illness. "[B]y definition, appellate counsel cannot be ineffective for a failure to raise an issue that lacks merit." *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001).

Further, the state trial court's conclusion -- that appellate counsel was not ineffective -- is not contrary to, or an unreasonable application of, *Strickland* or subsequent Supreme Court decisions regarding claims of ineffective assistance of appellate counsel.  Petitioner, therefore, has no right to relief on his claim about appellate counsel.

## IV.  Conclusion

Petitioner's claims lack substantive merit, and the state courts' rejection of his claims was not objectively unreasonable or so lacking in justification that there was an error beyond any possibility for fairminded disagreement.  Accordingly, the Court denies the amended petition for a writ of habeas corpus.

The Court declines to issue a certificate of appealability because reasonable jurists could not disagree with the Court's resolution of Petitioner's claims, nor conclude that the issues deserve encouragement to proceed further.  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

The Court, nevertheless, grants Petitioner permission to proceed *in forma pauperis* on appeal if he appeals this decision, because he was permitted to proceed without prepayment of the fees and costs for this action, *see* ECF No. 5, and an appeal could be taken in good faith.  28 U.S.C. § 1915(a)(3); Fed. R. App. P. 24(a)(3)(A).

IT IS SO ORDERED.

Dated: March 23, 2021                               s/Sean F. Cox
                                                              Sean F. Cox
                                                              U. S. District Judge